IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| GREENPEACE, INC., and CASCADIA WILDLANDS PROJECT, <br><br>        Plaintiffs, <br><br> vs. <br><br> FORREST COLE, in his official capacity as Forest Supervisor for the Tongass National Forest, DENNIS BSCHOR, in his official capacity as Alaska Regional Forester, and the U.S. FOREST SERVICE, <br><br>        Defendants. | Case No. 3:08-cv-0162-RRB <br><br><br> **ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

Plaintiffs Greenpeace, Inc., and Cascadia Wildlands Project ("Plaintiffs") challenge the United States Forest Service's approval of four timber sale projects in the Tongass National Forest, claiming violations of the National Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), and the 1997 Tongass National Forest Land and Resource Management Plan ("Forest Plan"). Plaintiffs seek declaratory and injunctive relief,

at Docket 52, to prevent environmental injury, particularly to deer and wolf populations within the forest. Defendants oppose at Docket 55 and seek summary judgment in their favor on all of the issues raised.

## II. FACTUAL BACKGROUND

The Tongass National Forest covers nearly 17 million acres across southeast Alaska, extending approximately 500 miles north to south and 120 miles east to west. Pursuant to the requirements of NFMA, the Forest Service adopted the Forest Plan in 1997. There are four projects challenged in this case which were approved pursuant to the 1997 Forest Plan: Scott Peak, Overlook, Traitors Cove, and Soda Nick. For each of the four projects, the Forest Service conducted an extensive environmental analysis, including either an environmental impact statement ("EIS") or an environmental assessment ("EA").

### A. The Forest Plan

The 1997 Forest Plan was adopted based on a Final Environmental Impact Statement ("FEIS"). The 1997 FEIS discussed the planning process and analysis used to develop the Forest Plan, described and analyzed the alternatives considered in detail, and discussed public objections to the plan. The Forest Plan was modified in January 2008, but the 2008 amendment does not apply to the projects at issue in this case. The 1997 Forest Plan, 1997

FEIS, and associated documents are included as part of the Administrative Record for the four challenged projects.

The 1997 Forest Plan sets forth a number of "Forest-Wide Standards and Guidelines."[1] Forest-Wide Standard and Guideline WILD112.II.B reads as follows:

> Provide the abundance and distribution of habitat necessary to maintain viable populations of existing native and desirable introduced species well-distributed in the planning area.[2]

Guideline WILD112 XI.A.3 sets 13 deer per square mile as the necessary density to "maintain sustainable wolf populations" due to the fact that deer are a crucial prey for wolves.[3] The Forest Service later adopted 18 deer per square mile guideline as the minimum to support hunting and wolves.[4]

**B. The Deer Model**

The Tongass National Forest uses a deer winter habitat capability model ("Deer Model") to produce a relative ranking of habitat suitability for Sitka black-tailed deer and, by extension, Alexander Archipelago wolves.[5] The model is based on variables

---

[1]     AR 10_006459.

[2]     AR 10_006739.

[3]     AR 10_006743.

[4]     AR 10_00004 at 2-155.

[5]     See AR 10_007428-32.5.

ORDER RE SUMMARY JUDGMENT MOTIONS - 3
3:08-CV-0162-RRB

affecting winter habitat, a primary limiting factor on deer populations.[6] The variables include vegetation type, typical winter snow level, elevation zone, and aspect (south, north, east, and west-facing slope).[7]

This ranking is expressed as a habitat suitability index ("HSI") score. The HSI scores are used to estimate habitat carrying capacity; that is, how many deer the area can support. In order to estimate habitat capability, the HSI score is multiplied by a constant, referred to as the "deer multiplier," to produce an estimate of deer carrying capacity for a given area.[8]

In 1995, the Forest Service convened a group of deer experts, including employees from the Forest Service, the Alaska Department of Fish and Game ("ADF&G"), and the U.S. Fish & Wildlife Service ("FWS"), to refine the deer model. The panel adopted a deer multiplier of seventy-five deer per square mile, based on deer density information and nutritionally-based estimates.[9]

---

[6]    Id.

[7]    Id.

[8]    In other words, an HSI score of 0.8 multiplied by a deer multiplier of 100 results in an estimated carrying capacity of 80 deer per square mile.

[9]    Id. at 7.

ORDER RE SUMMARY JUDGMENT MOTIONS - 4
3:08-CV-0162-RRB

In 1996, a second panel of wildlife biologists recommended modifying the model to better reflect available data on deer harvest levels and deer pellet group studies.[10] The range of HSI scores was adjusted to 0 to 1.3, and the deer multiplier was increased to 125 deer per square mile.[11] This model was used in the 1997 Forest Plan FEIS.

In September 1997, four biologists brought to the Forest Service's attention a recent paper by Dave Person (the "Person study") comparing pellet group surveys with the Forest Service's deer model.[12] The Person study suggested that 100 deer per square mile would be a more accurate deer multiplier.[13] In August 2002, the Tongass National Forest Supervisor formally adopted the 100 deer per square mile deer multiplier.[14] The Forest Service has since used a deer multiplier of 100 deer per square mile forest-wide and also in its analysis of the four projects challenged here.[15]

**C. The VolStrata Vegetation Classification System**

---

[10]   AR 10_007430.

[11]   See AR 603_2251 at 5; AR 10_007430; AR 603_2267 at 1.

[12]   AR 603_2264 at 29-33.

[13]   Id.

[14]   AR 30_0803 at 3.

[15]   See e.g., AR 30_0631.

ORDER RE SUMMARY JUDGMENT MOTIONS - 5
3:08-CV-0162-RRB

"VolStrata" refers to the vegetation classification system that the Forest Service used in its Deer Model for the four projects at issue.[16] Vegetation is a crucial element of suitable deer habitat. Vegetation, along with elevation zone, aspect, and typical snow level, formed the basis for the HSI scores included in the 1997 Deer Model.[17]

Before the VolStrata System was adopted, forested lands in the Tongass National Forest were classified by volume class, which was referred to as "Tim-Type" or "TIMTYP."[18] The Forest Service's use of TIMTYP was successfully challenged in court by an environmental group, which claimed that it was an insufficiently reliable way of categorizing timber volume.[19] In the 1997 Forest Plan the Forest Service replaced the TIMTYP volume class system with a volume strata classification system (i.e., VolStrata), which used the same data as the TIMTYP system but classified that data differently.[20]

In 2005, two Forest Service employees published a paper proposing a new vegetation model which became known as the "Size-

---

[16]    AR 10_007428-32.

[17]    Id.

[18]    AR 30_Dec2005FEIS_ROD_Vol_I at 3-102; AR 10_007316.

[19]    AR 10_007316-17.

[20]    AR 30_Dec2005FEIS_ROD_Vol_I at 3-102.

Density" model. The new Size-Density model had not been
sufficiently validated at the time the projects at issue were
undergoing review.[21] Because the new Size-Density model was not
ready for use, the Forest Service employed the VolStrata system in
evaluating these four projects.

## III. GOVERNING PROVISIONS

### A. NFMA

The National Forest Management Act, 16 U.S.C. §§ 1600 et seq.,
requires the Forest Service to develop and maintain forest resource
management plans.[22] After a forest plan is developed, all subsequent
agency actions must comply with NFMA and the governing forest
plan.[23] Substantively, NFMA requires that forest plans "provide for
diversity of plant and animal communities based on the suitability
and capability of the specific land area."[24]

### B. NEPA

The National Environmental Policy Act, 42 U.S.C. §§ 4321 et
seq., contains additional procedural requirements. Its purpose is
to ensure the decision-maker will have detailed information on

---

[21]    See AR 603_0647 at 3-139; AR 603_1208.

[22]    16 U.S.C. §§ 1604(a).

[23]    16 U.S.C. §§ 1604(I).

[24]    16 U.S.C. § 1604(g)(3)(B).

ORDER RE SUMMARY JUDGMENT MOTIONS - 7
3:08-CV-0162-RRB

environmental impacts and to provide that information to the public.[25] The Forest Service must prepare an Environmental Impact Study (EIS), which identifies environmental effects and alternative courses of action, when undertaking any management project.[26] "'In contrast to NFMA, NEPA exists to ensure a process, not to mandate particular results.'"[27] Under NEPA, the agency need only take a "hard look" at its proposed action.[28] However, the EIS "must respond explicitly and directly to conflicting views in order to satisfy NEPA's procedural requirements."[29]

In order to determine whether an EIS is required, NEPA regulations allow an agency to prepare a more limited document, known as an environmental assessment ("EA").[30] An EA is a "concise public document" that "briefly provide[s] sufficient evidence and

---

[25]    Ecology Center v. Castaneda, 574 F.3d 652, 656-57 ( 9th Cir. 2009) (citing Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754, 758 (9th Cir. 1996)).

[26]    Ecology Center at 657.

[27]    Ecology Center at 657 (quoting Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1063 (9th Cir. 2002)).

[28]    Ecology Center at 657 (quoting Neighbors of Cuddy Mountain at 1070).

[29]    Earth Island Institute v. U.S. Forest Service, 442 F.3d 1147, 1172 (9th Cir. 2006), cert. denied, 127 S. Ct. 1829 (2007), abrogated on other grounds, Winter v. Natural Resources Defense Council, Inc., 129 S. Ct. 365 (2008).

[30]    See 40 C.F.R. §§ 1501.3, 1501.4.

analysis for determining whether to prepare an [EIS]."[31] If the agency determines on the basis of the EA that an EIS is not required, it must then issue a "finding of no significant impact" ("FONSI"), which is a document "briefly presenting" the reasons that the agency action will not have a significant impact on the human environment.[32]

## IV. STANDARD OF REVIEW

The Administrative Procedure Act ("APA") governs judicial review of decisions under NEPA and NFMA.[33] Under the APA, an agency decision will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[34]

The Court's review under the arbitrary and capricious standard is narrow, and the Court may not substitute its own judgment for that of the agency.[35] Rather, the Court will reverse a decision as arbitrary and capricious only if 1) the agency relied on factors Congress did not intend it to consider, 2) entirely failed to consider an important aspect of the problem, or 3) offered an

---

[31]     40 C.F.R. 1508.9(a).

[32]     40 C.F.R. §§ 1501.4(e), 1508.13.

[33]     Ecology Center at 656 (citing Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)).

[34]     5 U.S.C. § 706(2)(A).

[35]     Ecology Center at 656 (citing Lands Council at 987).

explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[36]

## V. DISCUSSION

Plaintiffs seek a declaratory judgment that the Forest Service violated NEPA, NFMA, and the 1997 Forest Plan in approving each of the four timber projects. Plaintiffs also seek a permanent injunction against the projects until the alleged violations have been remedied.[37] The Court will address each allegation in turn.

### A. The Forest Service's Approval of the Projects Does Not Violate NEPA

Plaintiffs claim the Forest Service violated NEPA by failing to respond to and disclose opposing views regarding application of the deer multiplier and use of the VolStrata vegetation classification system. The Court disagrees.

#### 1. The Forest Service's Use of the Deer Multiplier and Discussion Thereof Complies With NEPA

Plaintiffs assert that the Forest Service erred in calculating the deer multiplier, and that it has failed to correct or even address this alleged mistake in its approval of the timber projects. According to Plaintiffs, the Forest Service "has been on

---

[36]    Id (citations omitted).

[37]    Docket 52 at 47.

notice since at least August of 2005 that it is applying the Deer

Multiplier incorrectly."[38] The specific "error" alleged by

Plaintiffs is that, when the Forest Service adjusted the deer

multiplier from 125 to 100, it should also have adjusted the

highest possible HSI score from 1.3 to 1.0.

In support of this allegation, Plaintiffs cite several

sources, two of which are of particular note. The first is a June

15, 2006 letter from Doug Larsen of the ADF&G, in which Mr Larsen

makes the following comments regarding the deer model:

> [The Person Study] analysis showed that [...] [a]n HSI
> score of 1 corresponded to a density of 100 deer/mi2. At
> the time of the analysis in 1996, an HSI score of 1.0 was
> the highest score possible. Subsequently, the highest HSI
> score was increased to 1.3. Therefore, the 100 deer/mi2
> used by Person would now apply to an HSI score of 1.3.[39]

Based on the Person Study, Mr. Larsen suggested that the Forest

Service "[a]dopt the deer multiplier of 100 deer/mi2 (the only

empirically derived value available)."[40]

The second important source cited by Plaintiffs is an April

27, 2007 letter from the State of Alaska, which contains comments

on the then-proposed Tongass Land and Resource Management Plan

---

[38]    Docket 52 at 22.

[39]    AR 31_1386 at 3.

[40]    AR 31_1386 at 4.

Amendment and Draft Environmental Impact Statement. In that letter, the State said

> It is unclear whether the USFS is using the deer HSI model correctly. The 1997 description of the model and its application was incorrect with respect to the deer multiplier. The highest HSI value (whether it is scaled to 1.0 or 1.3) should correspond to a density of 100 deer/mi$^2$.[41]

According to Plaintiffs, the Forest Service did not adequately address these concerns when it approved the four projects challenged in this suit.

The Forest Service responds that its use of the 0-1.3 HSI scale and 100 deer per square mile multiplier was not in error, but was rather the result of its own scientifically derived judgment to which the Court owes deference.[42] After having reviewed the relevant documents, the Court has determined that the Forest Service's application of the deer multiplier represents a bona fide scientific disagreement with the Plaintiffs' position, rather than simply an "error."

Using the scale adopted by the Forest Service, the estimated deer population for the most highly-rated habitat, a 1.3 on the HSI scale, would be 1.3 times 100, or 130 deer per square mile. Before the Forest Service lowered the deer multiplier from 125 to 100, the

---

[41]     AR 31_01357 at 30.

[42]     Docket 55 at 30-31.

most highly-rated habitat would have been estimated to have 162.5 deer, or 1.3 times 125. When the Forest Service lowered the multiplier to 100, it did so on the basis of the Person study, which suggested lowering the multiplier to 100 but did not suggest adjustment of the HSI scale.[43]

Plaintiffs have established that some experts dissent from the 1.3 HSI/100 deer multiplier standards. The State of Alaska's view as reflected in its April 27, 2007 letter is that the highest rated habitat should have a maximum estimate of 100 deer/square mile.[44] The 2006 letter from the Department of Fish and Game is less clear in prescribing adjustments to the deer multiplier. While Mr. Larsen of the ADF&G says that the Forest Service should "[a]dopt the deer multiplier of 100 deer/mi2"[45], nowhere in his letter does he indicate whether the highest HSI score should be scaled down from 1.3.

While there is clearly a legitimate scientific disagreement regarding the proper calculation of deer density in the Tongass National Forest, this Court's role "is simply to ensure that the Forest Service made no 'clear error of judgment' that would render

---

[43]    See AR 603_2264 at 32-33.

[44]    AR 31_01357 at 30.

[45]    AR 31_1386 at 4.

its action 'arbitrary and capricious.'"[46] The Forest Service's calculation of the HSI scale and deer multiplier is not a clear error of judgment. The 1.3 HSI/125 deer multiplier figures were derived from the 1996 panel of Tongass deer experts and adopted in the 1997 Forest Plan, which recommended a maximum density for optimal habitat of 162.5 deer per square mile. The later decision to adjust the deer multiplier down to 100 deer/square mile was based on the Person study recommendations. Both the 1996 panel and the Person study employed sound scientific principles, and the Forest Service's reliance on their conclusions was not "arbitrary and capricious."

"'[W]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.'"[47] The Forest Service relied on the reasonable opinions of its own experts in formulating the HSI scale and deer multiplier. The Court will not substitute its own scientific judgment for that of the Forest Service experts.

Furthermore, Plaintiffs' objection that the Forest Service did not adequately respond to their concerns regarding the deer

---

[46] Lands Council at 993.

[47] Lands Council, 537 F.3d at 1000 (citations omitted).

multiplier and HSI scale is ill-founded. The Forest Service responded to their objections rather extensively in Appendix C to the Scott Peak Project EIS,[48] with further discussion in the appeal deciding officer's recommendations regarding the Scott Peak Project[49] and Overlook Project[50]. Those earlier responses to Plaintiffs' comments were later cited in Appendix D to the EA for the Traitor's Cove project,[51] and the Appeal deciding Officer's Recommendation regarding the Soda Nick Project[52]. Although Plaintiffs argue that the Forest Service's responses were not substantive, the Court has reviewed the responses and determined that they were detailed and adequately addressed Plaintiffs' arguments on the basis of scientific studies.

   2.   **The Forest Service's Use of the VolStrata System and Discussion Thereof Complies With NEPA**

Plaintiffs next claim that the Forest Service failed to respond substantively to Plaintiffs' concerns regarding the VolStrata Vegetation Classification System. According to

---

[48]   See AR 30_Dec2005_Scott PeakFEIS_ROD_Vol_2 at C26-C48 (Greenpeace et al. comment letter), C49-C66 (Response to Greenpeace et al. comment letter).

[49]   AR 30_0941 at 11-13.

[50]   Docket 55, Exhibit 19 at 15.

[51]   AR 31_1277 at D111-12.

[52]   AR 32_00400 at 2-3.

Case 3:08-cv-00162-RRB   Document 66   Filed 04/28/10   Page 15 of 23

Plaintiffs, "the Vol-Strata dataset is not correlated to deer
habitat quality because the dataset focuses on total timber volume
and not forest structure, which determines a forest stand's value
as habitat for deer."[53] In support of this assertion, Plaintiffs
cite, among other sources, a 2006 letter from the ADF&G:

> Vol-Strata may incorrectly identify some high volume
> forest stands important for ecosystem function . . . .
> For deer and other wildlife it would actually be better
> to use the old Tim-Type classification until the [Size-
> Density] model is ready to be implemented.[54]

The ADF&G suggested either adopting the new Size-Density Model or
reverting to the TIMTYP System.[55]

Just as it was not a "clear error of judgment" for the Forest
Service to rely on its own scientific conclusions regarding the
deer multiplier, it was not a clear error for the Forest Service to
employ the Vol-Strata System. At the time that the four projects
were approved, the Forest Service had essentially three choices of
systems for evaluating timber volume and structure: TIMTYP, Vol-
Strata, or Size-Density. The reliability of TIMTYP has already been
successfully challenged in court proceedings. As for the Size-
Density system, the ADF&G acknowledged that it was not "ready to be

---

[53]    Docket 52 at 35.

[54]    AR 32_0411 at 10.

[55]    AR 32_0411 at 11.

implemented." Therefore, it was reasonable for the Forest Service to conclude that Vol-Strata was the best tool then available.

Nor can it fairly be said that the Forest Service has failed to acknowledge Plaintiffs' concerns regarding the Vol-Strata System. The Forest Service discussed the potential weaknesses of the VolStrata System in the 1997 FEIS, shortly after its adoption:

> Volume class is often a poor surrogate for habitat quality, although it is one component used to model habitat and is available in our resource inventory[...] However many other habitat considerations are used to identify habitat quality[...] These include elevation, aspect, vegetation, forest type, successional stage of vegetation development, travel corridors, landscape position (beach, riparian, and estuary), human influences, and other factors.[56]

In the Scott Peak EIS, the Forest Service also acknowledged "that timber volume and forest structure are not interchangeable attributes."[57] Thus, the Forest Service acknowledged the imperfections of the VolStrata System, but compensated for those deficiencies by taking other factors into account when classifying deer habitat. Moreover, in approving the challenged timber projects, the Forest Service clearly stated, though not at great

---

[56]    AR 10-009292.

[57]    AR 30_Dec2005FEIS_ROD_Vol_2 at C54.

length, its reasons for using the VolStrata System rather than either TIMTYP[58] or Size-Density.[59]

The Forest Service's adoption of the new Size-Density system the 2008 Forest Plan Amendment is obviously a tacit acknowledgment that the VolStrata System no longer represents the state of the art in vegetation classification. However, it was reasonable for the Forest to conclude at the time the projects were approved that the VolStrata System was superior to any other available. As noted above, the NEPA only requires the Forest Service to take a "hard look" at the environmental consequences of the proposed projects. It does not mandate any specific scientific process for evaluating that impact. The Forest Service's use and discussion of the Vol-Strata System met the NEPA standard.

     **3.    Plaintiffs' Further Objections Under NEPA Are Ill-Founded.**

Plaintiffs further allege that the EISs and EAs at issue do not disclose "the many shortcomings of the Deer Model to determine accurately deer habitat capability."[60] The Administrative Record does not support this assertion. The Forest Service discussed several potential shortcomings of the Deer Model, including 1) the

---

[58]    AR 30_Dec2005FEIS_ROD_Vol_2 at C53-C54.

[59]    AR 31-01277 at D-110.

[60]    Docket 52 at 28.

fact that the Deer Model does not address "the fragmentation of large blocks of timber, the maintenance of travel corridors, and the effects of roading"[61]; 2) that HSI alone is not a sufficient predictor of actual deer population, because it fails to take into account "severe winters, disease, predation, and hunting"[62]; and 3) the limitations of the VolStrata System, as discussed above.

A thorough review of the record shows that the Forest Service used the Deer Model to estimate deer population, but that it did not rely solely upon that model in analyzing deer habitat. Moreover, the Forest Service acknowledged the weaknesses of the deer model in the EISs and EAs at issue here. Had the Forest Service relied solely on a deficient deer model, or had it obscured the deficiencies of that model, then the projects would not pass muster under NEPA. That simply is not the case here. The Forest Service took the sufficient "hard look" at the strengths and weaknesses of the Deer Model, and therefore complied with NEPA.

**B.   The Forest Service's Approval of the Projects Complies with NFMA.**

Plaintiffs allege that the Forest Service violated the NFMA in two different ways. First, Plaintiffs argue that the Forest Service did not employ the "best available science" standard in evaluating

---

[61]   AR 33_0336 at 51,

[62]   AR 10_009767.

the projects, as required by 36 C.F.R. § 219.35(a) (2000). They also claim that the projects do not comply with the Forest Plan, as required by NFMA.

### 1. The Forest Service Applied the Best Available Science Standard in its Approval of the Timber Projects

Plaintiffs assert that "the Forest Service never makes any claim that it considered the 'best available science' standard in its management decisions."[63] Essentially, Plaintiffs argue that the Forest Service's explanations of its scientific reasoning are insufficient without a specific finding that its reasoning represents the "best available science", or without a discussion of that particular legal standard.

The Court disagrees. As noted in the above discussion of the Deer Model and VolStrata System, the Forest Service stated clearly the reasons why it chose to use certain scientific methods, data and calculations in evaluating the projects. No one could read the EISs and EAs at issue in this case and doubt that the Forest Service believes it has relied on the best available science. The Forest Service's failure to employ the phrase "best available science" within the Administrative Record is therefore irrelevant.

---

[63]     Docket 52 at 35.

## 2. The Forest Service Complied with the 1997 Forest Plan Standards and Guidelines

Plaintiffs assert that the projects violate the 1997 Forest Plan Standards and Guidelines because the VolStrata System "does not accurately describe the value of forest stands as deer winter habitat."[64] According to Plaintiffs, due to this inaccuracy, the timber projects violate the Forest Plan guideline which requires the Forest Service to "[p]rovide the abundance and distribution of habitat necessary to maintain viable populations of existing native" species.[65] Plaintiffs cite <u>Lands Council</u>, which states that "use of habitat as a proxy [for species population] may be arbitrary and capricious" if "the record indicates that the Forest Service based its habitat calculations on outdated or inaccurate information."[66]

As noted above, the Forest Service adopted the VolStrata System after much study and deliberation. Of course, the Forest Service has moved on to the more advanced Size-Density model since the projects were approved. Plaintiffs cite this fact as evidence

---

[64]    Docket 52 at 39.

[65]    AR 10_006739.

[66]    537 F.3d at 998.

that the VolStrata System is unreliable, noting that the Size-Density model results in a lower estimate of HSI values.[67]

The Court has held above that the Forest Service's decision to use the VolStrata System was a reasonable one given the alternatives available at the time the projects were approved. The mere fact that the Forest Service no longer uses VolStrata does not prove its unreliability. Both VolStrata and Size-Density are used merely as tools for estimating deer habitat; neither one could possibly be perfect, but both were developed by expert wildlife biologists and are based on sound scientific principles. And as noted above, the Forest Service did not rely on VolStrata alone in evaluating the impact of the projects on deer population. Therefore, its reliance on the VolStrata System was not "arbitrary and capricious", and did not violate the Forest Plan guidelines.

## V. CONCLUSION

The Forest Service took a "hard look" at the environmental impact of the four timber projects challenged here, as required by NEPA. The Forest Service evaluated the Deer Model and the VolStrata System on the basis of what it deemed to be the best available science, including the studies and conclusions of biologists both within the Forest Service and without. These conclusions were not

---

[67]    AR 603_0647 at 3-192.

a "clear error of judgment," and complied with the substantive and procedural requirements of NEPA, NFMA, and the Forest Plan. Summary Judgment is therefore GRANTED in favor of defendants. Plaintiffs' Motion for Summary Judgment at **Docket 52** is accordingly **DENIED**. Defendants' Motion at **Docket 61** to strike the declaration of Dr. Victor Van Ballenberghe is **DENIED AS MOOT** because Plaintiffs' claims are insufficient even if the declaration is taken into account.

       **IT IS SO ORDERED.**

       ENTERED this 27th day of April, 2010.

                       S/RALPH R. BEISTLINE
                       UNITED STATES DISTRICT JUDGE